MICHIGAN NATIONAL BANK *v.* DEPARTMENT OF REVENUE.

1. TAXATION—NATIONAL BANK STOCK—EXEMPTION OF MONEYED CAPITAL.

   The exemption from taxation of shares of stock in national banks does not follow merely from the fact that some other moneyed capital was exempt (RS § 5219).

2. SAME—NATIONAL BANK STOCK—STATES—EXEMPTIONS.

   The act of congress permitting State taxation of shares of stock in national banks but requiring capital so invested should not be taxed at a greater rate than like property similarly invested was not intended to cut off the power to exempt particular kinds of property if the State legislature chose to do so, the purpose of the statute being to protect such banks from unfriendly discrimination (RS § 5219).

3. SAME—NATIONAL BANK STOCK—BUILDING AND LOAN ASSOCIATIONS —EXEMPTIONS.

   Capital invested in building and loan associations cannot be regarded as moneyed capital, within the meaning of act of

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 51 Am Jur, Taxation § 262.
[2] 51 Am Jur, Taxation § 269.
   Discrimination in state taxation of national banks or national bank shares.   59 ALR 10; 81 ALR 502; 87 ALR 846.
[3, 4] 51 Am Jur, Taxation § 271.
[5, 7] 51 Am Jur, Taxation § 273.
[6] 51 Am Jur, Taxation § 275.
[8] 51 Am Jur, Taxation § 268 *et seq.*
[9] 14 Am Jur, Costs § 91.

congress permitting State taxation of shares of stock in national banks but not at a greater rate than like property similarly invested, so as to prevent the partial exemption of building and loan association shares from taxation on the basis of public policy, in view of the noncompetitive purpose for which the latter organizations are formed, to loan to its own members and to assist them in accumulating savings, and their treatment in other Federal statutes (RS § 5219; CL 1948, § 489.1; CLS 1956, § 205.132a).

4. SAME—NATIONAL BANK STOCK—MONEYED CAPITAL.

The term "other moneyed capital" in act of congress permitting State taxation of shares of stock in national bank but requiring that capital so invested should not be taxed at a greater rate than like property similarly invested was not intended to include all moneyed capital not invested in national banks but only that which is employed in such way as to bring it in substantial competition with the business of national banks (RS § 5219).

5. SAME—NATIONAL BANK STOCK—MONEYED CAPITAL—COMPETITION.

"Moneyed capital" is brought into competition with national banks, as the term is used in the act of congress limiting State taxation of shares of stock in national banks to not more than competitive moneyed capital, where it is invested in shares of State banks or in private banking or where employed in the loan and investment features of banking in making loans, discount or otherwise, in notes, bonds, or other securities (RS § 5219).

6. SAME—NATIONAL BANK STOCK—MONEYED CAPITAL.

Restriction upon States in the taxation of shares of stock in national banks is not intended to exact mathematical equality between them and other moneyed capital nor to do more than require such practical equality as is reasonably attainable in view of the differing situations of such properties (RS § 5219).

7. SAME—INTANGIBLES TAX—NATIONAL BANK STOCK—OTHER MONEYED CAPITAL.

Whether or not moneyed capital in the hands of others than national banks and the relation of its employment, in point of competition, to the business of national banks, is a mixed question of law and fact in determining validity of State intangibles tax imposed upon shares of stock in national banks (RS § 5219; CLS 1956, § 205.132a).

8. SAME—NATIONAL BANKS—BUILDING AND LOAN ASSOCIATIONS—IN-
   TANGIBLES TAX.
   Record on appeal in proceeding by national bank to recover pro-
      tested payment of intangible tax assessment *held*, to disclose
      that State building and loan associations operated in a narrow,
      restricted field, are markedly different in character, purpose,
      and organization from national banks, and are not in substan-
      tial competition with them; that there was practical equality
      of the total tax imposed upon building and loan associations
      and upon national banks; and that plaintiff had not sustained
      its burden of showing that the tax imposed violated the act
      of congress permitting States to tax shares of stock in na-
      tional banks (RS § 5219; CLS 1956, § 205.132a).

9. COSTS—PUBLIC QUESTION—INTANGIBLES TAX—NATIONAL BANKS.
   No costs are allowed in proceeding involving determination of
      validity of intangibles tax on shares of stock in national bank, a
      public question being involved (RS § 5219; CLS 1956, § 205-
      .132a).

Appeal from Court of Claims; Searl (Fred N.), J.,
presiding. Submitted October 8, 1959. (Docket No.
27, Calendar No. 48,138.) Decided February 25,
1960.

Petition by Michigan National Bank, a national
banking association, against the State of Michigan,
Department of Revenue, and State Commissioner of
Revenue to recover payment under protest of in-
tangible tax assessment on bank stock. Five other
national banks intervened but did not participate in
trial or appeal. Judgment for defendants. Plaintiff
appeals. Affirmed.

*Butzel, Eaman, Long, Gust & Kennedy* (*Thomas G.
Long, Victor W. Klein, Philip T. Van Zile II,* and
*Harold A. Ruemenapp,* of counsel), for plaintiff.

*Paul L. Adams,* Attorney General, *Samuel J.
Torina,* Solicitor General, *T. Carl Holbrook, William
D. Dexter, Maurice Barbour* and *Richard R. Roesch,*
Assistants Attorney General, for defendants.

KELLY, J.   Plaintiff's action to recover a 1952 deficiency intangibles tax assessment in the amount of $49,929.27 resulted in judgment of no cause of action.

This appeal presents the question of whether CLS 1956, § 205.132a (Stat Ann 1957 Cum Supp § 7.556 [2a]), imposing a tax on bank shares, is invalid because it violates section 5219 of the Revised Statutes of the United States (12 USCA, § 548).

In 1953 (PA 1953, No 9) the legislature amended the intangibles tax law so as to place both State and national banks in a special and more heavily taxed category, imposing a tax on bank shares at the rate of 5-1/2 mills ($5.50 per $1,000) "on the privilege of ownership of each  *  *  *  share of stock" based on the "capital account" of each bank.   "Capital account" was defined to be the "capital, surplus and undivided profits" as shown on the latest annual report for each year—in this case as of December 31, 1952.

Appellant's position is set forth in its brief as follows:

"This is not a case of tax avoidance or claimed immunity by appellant.  *  *  *  The singularly important and impelling object of this case is to assure tax equality with competitors.   The powerful and rapidly growing savings and loan associations (or their shareholders) should be taxed at the same rate as shares in national banks in Michigan, as required under RS § 5219—regardless of what that rate may be."

The validity of the tax imposed under PA 1953, No 9, must rest upon the grant of congressional authority contained in 12 USCA, § 548 (RS § 5219), whereby congress conferred upon the States the power to tax national bank shares, providing that:

"The several States may (1) tax said shares \* \* \* provided the following conditions are complied with:
\*   \*   \*

"(b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: *Provided,* That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section."

Five intervening national banks asserted that they had similarly paid the 1952 tax under protest and sought to recover the amount so paid. The court, however, confined the proofs to the plaintiff, Michigan National Bank, and adjudicated only plaintiff's case.

The Michigan Bankers Association took a contra view to that of appellant, as is disclosed by the following from the trial court's opinion:

"The Michigan Bankers Association (representing both State and national banks) has been permitted to file a brief as *amicus curiae* in which it states the position of its members in these words:

" 'The Michigan Bankers Association has followed the trial of this case and requested permission to file this brief because of its conviction that the present system of the State of Michigan for the taxation of banks is reasonable from the viewpoint of the public, equitable from the viewpoint of the competitors, and practical from the viewpoint of the banks themselves. Actual experience with the taxation system shows that it has produced a reasonable amount of revenue to the State; that it has not created any competitive disadvantage among the various types of institu-

tions; and that it has proven to be simple to administer. Such a system is obviously desirable, and this association, believing the system to be entirely legal within the limitations of the Federal Constitution and statutes, does not want to see it destroyed.'

"And their counsel takes substantially the same position upon the several questions presented as does the attorney general on behalf of the defendants."

Plaintiff has its principal banking office in the city of Lansing. It carries on a banking business in that city and in the cities of Battle Creek, Flint, Grand Rapids, Marshall, Port Huron, and Saginaw. In these cities there are 16 building/savings and loan associations.

Appellant was incorporated in 1941, and from December, 1941, to December 31, 1957, appellant had grown in total resources from about $68,000,000 to approximately $481,000,000, without the issuance of any additional common stock except stock dividends.

The transcript of testimony amounted to thousands of pages and hundreds of exhibits were introduced. The printed appendices and briefs consist of more than 1,650 pages.

Plaintiff offered testimony of officers of the loan associations and of plaintiff bank as to the claimed existence of mortgage loan competition between the 2 types of institutions, contending that:

"The *only* important questions are whether the capital employed by savings and loan associations in competition with national banks is substantial compared to the latter's capitalization and whether the residential mortgage loan business is a substantial phase of the business of national banks."

Plaintiff introduced proof in regard to the growth of savings and loan associations to the effect that in 1900 the associations were composed of poor people who had banded themselves together in neighborhood

groups, obligating themselves to set aside small weekly savings in order that they might mutually enable other savings members to borrow to build small homes; that banking facilities were not available to such groups, as national banks had at that time no authority to accept savings accounts nor to engage in the home mortgage loan business; that the associations of today are Statewide and nationwide in operation and their moneyed capital is no longer obtained from nor loaned to the poorer class; that in 1900 the total assets of all associations in Michigan were only slightly over $10,000,000, but by 1952 these assets had increased to over $537,000,000.

Plaintiff also introduced proof that the loaning of money on the basis of mortgages secured by residential real estate, was a substantial phase of its business; that as of December 31, 1952, appellant held aggregate real-estate loans of $62,000,000 and, in addition, had outstanding unsecured loans of approximately $8,000,000 for repair and modernization of residential property; that these loans amounted to approximately 22% of the total assets of appellant bank ($305,802,000); that as of that date the loans secured by mortgages on residential real estate were of the following types: FHA, approximately $27,-000,000; VA, $9,000,000; and conventionals, $15,-000,000.

Appellant disclosed, by the public records of the register of deeds office in each of the 6 counties where plaintiff's banks were located, that during the year 1952, 2,934 mortgages were recorded by appellant, totalling $23,089,907.33, of which approximately $18,600,000 represented residential real estate loans; and that in the same counties in 1952 the records disclosed that the 16 savings and loan associations recorded 6,498 mortgages totalling $35,575,546.27, some of which, however, were secured by commercial property.

Defendants summarize their position as follows:

"In the last analysis, savings and loan associations cannot be in 'substantial competition with the business of national banks' because they cannot and do not engage sufficiently in the activities characteristically carried on by the national banks. Stated another way, if they are not comparable institutions in substance, how can they be in substantial competition?"

To substantiate their position, defendants offered proof showing:

(1) While appellant engaged in all activities permitted national banking associations, including the ability to create checkbook money and receive time, savings, and demand deposits, savings and loan associations were able to engage solely in the narrow activity of making first mortgage loans secured by residential properties (with minor exceptions) or loans on the security of its savings shares accounts.

(2) During 1952 the 16 savings and loan associations doing business in the same cities as appellant bank made total commercial loans secured by business properties amounting to $293,000—.9 of 1% of their total real-estate loans, or about 1/4 of 1% of their total assets. Appellant bank made such loans in the approximate amount of $8,000,000, which constituted 13% of its total real-estate loans and was in excess of 2-1/2% of its total assets. Of loans made by the savings and loan associations, practically all—99.1%—were secured by residential real estate, while only 87% of appellant's mortgage loans were so secured. Of these 87%, 70% or 7/10 were guaranteed by the Federal government as FHA and VA loans. Therefore, only 25% of appellant's mortgages were conventional residential nonbusiness mortgages; 60% were guaranteed FHA and VA

mortgages; and 13% were mortgages on commercial property. The 16 associations, on the other hand, carried FHA and VA loans amounting to only 19% of total loans, conventional residential nonbusiness loans amounting to 79.963% of their total loans, and mortgages on commercial property being practically nil.

(3) The total loan activities engaged in by the institutions illustrate different objectives. Only 42% of appellant bank's total loans were secured by real estate, while 58% were not so secured. All of the associations' loans were secured by real estate.

(4) About 20% of appellant's total assets were employed in mortgage loans and approximately 23% of its interest income was received from mortgage loans. In the loan field, appellant's instalment loans, unsecured by real estate, were the most profitable. Here appellant received approximately 45% of its total interest income from the employment of approximately 19% of its total assets.

(5) In 1952 appellant had total deposits of some $283,000,000, classified into approximately $165,000,-000 of commercial deposits (including $22,000,000 of public funds) upon which no interest was paid to the depositors, approximately $37,000,000 in time certificates, and approximately $81,000,000 in savings deposits. In 1952 all the funds it had to loan were from deposits. Appellant used all of its funds —capital, surplus, undivided profits, reserves, and deposits, for the operation of its business. It cannot allocate or trace any dollar of its capital account to any particular mortgage or loan business. The savings and loan associations of Michigan cannot accept deposits, and, therefore, had none.

The court justified its finding of no cause of action by stating its conclusions as follows:

"1. Since 1887, the courts have consistently held in every case squarely involving the question that the State may exempt or prefer on the ground of public policy mutual savings bank and other like institutions, provided such exemption is based on just reason and is not made for the hostile purpose of an unfriendly discrimination with national banks.

"2. That the power of the State to make such exemptions on the ground of public policy is an important one, grounded in history and on precedent. The intention of congress to destroy it should not be lightly inferred.

"3. The 1923 and 1926 amendments to section 5219 and the amendments to the Federal reserve act broadening the powers of the national banks were not intended to take from the State such long established and well-recognized power.

"4. That from their beginnings and continuously throughout their history, building and loan associations have been similar in character and purpose to and of the same general class of mutual thrift and home financing institutions as mutual savings banks.

"5. That congress in the home owners loan act of 1933 definitely recognized and approved such classification of savings/building and loan associations and the propriety of different tax treatments of banks and such associations and in effect, said that money invested in such associations is not moneyed capital in competition with the business of national banks.

"6. That Michigan's tax treatment of savings/building and loan associations is based upon just cause and does not evidence an intent to create or foster a hostile or unfriendly discrimination against national banks."

The general rule of partial exemption under RS § 5219 has been well established, as is disclosed by the following decisions:

*Hepburn* v. *School Directors,* 23 Wall (90 US) 480, 485 (23 L ed 112):

"It could not have been the intention of congress to exempt bank shares from taxation because some moneyed capital was exempt. Certainly there is no presumption in favor of such an intention. To have effect it must be manifest. The affirmative of the proposition rests upon him who asserts it."

*Adams* v. *Nashville,* 95 US 19, 22 (24 L ed 369), in holding that an exemption of investments in municipal bonds did not violate RS § 5219, the court held:

"The act of congress was not intended to curtail the State power on the subject of taxation. It simply required that capital invested in national banks should not be taxed at a greater rate than like property similarly invested. It was not intended to cut off the power to exempt particular kinds of property, if the legislature chose to do so.   *   *   *   The discretionary power of the legislature of the States over all these subjects remains as it was before the act of congress of June, 1864. The plain intention of that statute was to protect the corporations formed under its authority from unfriendly discrimination by the States in the exercise of their taxing power."

*Boyer* v. *Boyer,* 113 US 689, 693 (5 S Ct 706, 28 L ed 1089), the court in concluding that the Pennsylvania statute was inconsistent with RS § 5219 distinguished *Hepburn* v. *School Directors, supra,* stating:

"What the court had to decide, and all that it did decide, was whether the exemption from local taxation, of mortgages, judgments, recognizances, and money due upon agreements for the sale of real estate, in the hands of individuals, was a partial exemption only; that is, whether it was so substantial in its nature and operation as to affect the integrity of the general assessment for local purposes.   *   *   *   That case is authority for the proposition that a *partial* exemption by a State, for local purposes, of moneyed capital in the hands of individual citizens does not,

of itself and without reference to the aggregate amount of moneyed capital not so exempted, establish the right to a similar exemption in favor of national bank shares held by persons within the same jurisdiction."

*Mercantile Bank* v. *New York,* 121 US 138 (7 S Ct 826, 30 L ed 895). This case is recognized as an important one in interpreting RS § 5219. The court relied upon *Hepburn* v. *School Directors, supra,* and in determining that for public policy reasons section 5219 was not violated by State exemptions, the court held (pp 145, 146, 161):

"The proposition which the appellant seeks to establish is, that the State of New York, in seeking to tax national bank shares, has not complied with the condition contained in section 5219 of the Revised Statutes  *  *  *  'in that, it has by its legislation expressly exempted from all taxes in the hands of the individual citizens numerous species of moneyed capital, aggregating in actual value the sum of $1,686,000,000, whilst it has by its laws subjected national bank shares in the hands of individual holders thereof (aggregating a par value of $83,000,000), and State bank shares (having a like value of $22,-815,700), to taxation upon their full actual value, less only a proportionate amount of the real estate owned by the bank.' This exemption, it is claimed, is of a 'very material part relatively' of the whole, and renders the taxation of national bank shares void.  *  *  *

"The only limitation, upon deliberate reflection, we now think it necessary to add, is that these exemptions should be founded upon just reason, and not operate as an unfriendly discrimination against investments in national bank shares. However large, therefore, may be the amount of moneyed capital in the hands of individuals, in the shape of deposits in savings banks as now organized, which the policy of the State exempts from taxation for its own purposes, that exemption cannot affect the rule for the

taxation of shares in national banks, provided they are taxed at a rate not greater than other moneyed capital in the hands of individual citizens otherwise subject to taxation."

Tax exemption or preferential tax treatment has been applied to mutual savings banks and savings and loan associations, as is disclosed by the following cases:

*Mercantile Bank* v. *New York,* 121 US 138, 160 (7 S Ct 826, 30 L ed 895), in construing RS § 5219 and justifying exemptions granted to savings banks, the court said (pp 160, 161):

"It cannot be denied that these deposits constitute moneyed capital in the hands of individuals within the terms of any definition which can be given to that phrase; but we are equally clear that they are not within the meaning of the act of congress in such a sense as to require that, if they are exempted from taxation, shares of stock in national banks must thereby also be exempted from taxation. No one can suppose for a moment that savings banks come into any possible competition with national banks of the United States. They are what their name indicates, banks of deposit for the accumulation of small savings belonging to the industrious and thrifty. To promote their growth and progress is the obvious interest and manifest policy of the State. Their multiplication cannot in any sense injuriously affect any legitimate enterprise in the community. We have already seen that by previous decisions of this court it has been declared that 'it could not have been the intention of congress to exempt bank shares from taxation because some moneyed capital was exempt;' *Hepburn* v. *School Directors,* 23 Wall (90 US) 480 (23 L ed 112); and that 'the act of congress was not intended to curtail the State power on the subject of taxation. It simply required that capital invested in national banks should not be taxed at a greater rate than like property similarly invested.

It was not intended to cut off the power to exempt particular kinds of property, if the legislature chose to do so.' *Adams* v. *Nashville,* 95 US 19 (24 L ed 369)."

*Davenport Bank* v. *Davenport Board of Equalization,* 123 US 83, 86 (8 S Ct 73, 31 L ed 94), in upholding exemptions of savings banks, the court again held:

"The whole subject has been recently considered by this court in the case of *Mercantile Bank* v. *New York,* 121 US 138 (7 S Ct 826, 30 L ed 895). In that opinion it was held that, while the deposits in the savings banks of New York constituted moneyed capital in the hands of individuals, yet it was clear that they were not within the meaning of the act of congress in such a sense as to require that because they were exempted from taxation the shares of stock in national banks must also be exempted. The reason given for this is that the institutions generally established under that name are intended for the deposits of the small savings and accumulations of the industrious and thrifty; that to promote their growth and progress is the obvious interest and manifest policy of the State; and, as was said in *Hepburn* v. *School Directors,* 23 Wall (90 US) 480 (23 L ed 112), it could not have been the intention of congress to exempt bank shares from taxation because some moneyed capital was exempt."

*Bank of Redemption* v. *Boston,* 125 US 60 (8 S Ct 772, 31 L ed 689). Counsel urged that there was such a marked difference between the Massachusetts and the New York mutual savings banks, the *Mercantile Bank Case, supra,* would not apply. In disposing of this contention, the court therein stated (pp 66–68):

"The tax on savings banks is based upon deposits merely. This is because deposits furnish the only

capital which is invested and employed. The institutions themselves, although corporations, have no capital stock, and are managed by trustees, not selected by the depositors, but by public authority. The whole amount of the deposits, with the exceptions noted, are subjected to a tax of 1/2 of 1%. On the other hand, the national banks pay a tax assessed upon the market value of the shares as personal property, upon a valuation and at a rate exactly equal to that of all other personal property subject to taxation in the State. But shares of the national banks, while they constitute the capital stock of the corporations, do not represent the whole amount of the capital actually employed by them. They have deposits, too, shown in the present record to amount, in Massachusetts, to $132,042,332. The banks are not assessed for taxation on any part of these, although these deposits constitute a large part of the actual capital profitably employed by the banks in the conduct of their banking business. But it is not necessary to establish the exact equality in result of the 2 modes of taxation. The question of the exemption from taxation of deposits in savings banks, as affecting the rule for the State taxation of national bank shares, was very deliberately considered by this court in the case of *Mercantile Bank* v. *New York,* 121 US 138, 160 (7 S Ct 826, 30 L ed 895); and the conclusion reached in that case was reaffirmed in the case of *Davenport Bank* v. *Davenport Board of Equalization,* 123 US 83 (8 S Ct 73, 31 L ed 94).    *   *   *

"It is impossible, in our judgment, to distinguish the present from the case of the New York savings banks, or of those of Iowa considered in the case of the Davenport Bank.   *   *   *

"It is alleged that in Massachusetts savings banks are permitted to transact a banking business in the way of loans upon personal securities, which assimilates them more closely to national banks, and takes away the reason for the application of the rule to them which was applied to the case of the savings banks of New York. But the difference

mentioned, if it exists at all, is immaterial; the main purpose and chief object of savings banks, as organized under the laws of Massachusetts, are the same as those in New York, as considered in the case of the Mercantile Bank. They are substantially institutions, under public management, in pursuance of a great and beneficial public policy, organized for the purpose of investing the savings of small depositors, and not as banking institutions in the commercial sense of that phrase. We adhere to the rule as declared in the cases heretofore decided, which forecloses further discussion."

*Aberdeen Bank* v. *Chehalis County,* 166 US 440, 460, 461 (17 S Ct 629, 41 L ed 1069). The court reaffirmed the 3 cases cited above, with emphasis on the *Mercantile Bank* decision, and stated:

"As to savings banks it was held that, though it could not be denied that their deposits constituted moneyed capital in the hands of individuals, yet it was clear that they were not within the meaning of the act of congress in such a sense as to require that, if they are exempted from taxation, shares of stock in national banks must also be exempted; that it was part of the policy of the State to encourage the accumulation of small savings belonging to the industrious and thrifty, and it was within the reasonable exercise of the power of the State to exempt particular kinds of property.   *   *   *

"The conclusions to be deduced from these decisions are that money invested in corporations or in individual enterprises that carry on the business of railroads, of manufacturing enterprises, mining investments, and investments in mortgages, does not come into competition with the business of national banks, and is not therefore within the meaning of the act of congress; that such stocks as those in insurance companies may be legitimately taxed on income instead of on value, because such companies are not competitors for business with national banks; and that exemptions, however large, of deposits in

savings banks, or of moneys belonging to charitable
institutions, if exempted for reasons of public policy
and not as an unfriendly discrimination against in-
vestments in national bank shares, should not be re-
garded as forbidden by section 5219 of the Revised
Statutes of the United States."

*First National Bank of Wellington* v. *Chapman,*
173 US 205, 214 (19 S Ct 407, 43 L ed 669):

"The result seems to be that the term 'moneyed
capital,' as used in the Federal statute, does not in-
clude capital which does not come into competition
with the business of national banks, and that ex-
emptions from taxation, however large, such as de-
posits in savings banks or moneys belonging to
charitable institutions, which are exempted for rea-
sons of public policy and not as an unfriendly dis-
crimination as against investments in national bank
shares, cannot be regarded as forbidden by the
Federal statute."

The approval of the supreme court of the United
States of partial exemptions of mutual savings banks
also applies to savings and loan associations, as
shown by the following decisions:

*Mercantile National Bank of Cleveland* v. *Hubbard*
(ND Ohio) 98 F 465, 471. Judge Taft wrote the
opinion and clearly differentiated between national
banks and building and loan associations, stating:

"There is proof of the capital in savings banks,
and also of the capital invested in building and loan
associations; but, under the decision of *Mercantile
Bank* v. *New York,* 121 US 138 (7 S Ct 826, 30 L ed
895), capital invested in savings banks cannot be
regarded as moneyed capital, within the meaning of
section 5219, exemption of which from taxation can
constitute a discrimination within the inhibition of
that section. It seems to me that building associa-
tions are certainly not to be differentiated in their
purpose or object, or practical effect, from savings

banks, and that the capital invested in them, though subject to a somewhat different rule of taxation, cannot be regarded as moneyed capital in competition with the moneyed capital in national banks, any more than is capital invested in savings banks. The chief object of building associations is to encourage the building of small houses by poor people, and the saving from their earnings, week by week, of an amount sufficient to pay the mortgage debts incurred in the purchase of the land and the construction of the house. The mere fact that every shareholder in a building association need not be a borrower cannot, I think, change the effect of the general purpose of the building association law."

This case was reversed by the circuit court of appeals in *Mercantile National Bank of Cleveland* v. *Hubbard* (CCA 6), 105 F 809. Upon remand injunction issued in *Mercantile National Bank of Cleveland* v. *Lander* (ND Ohio), 109 F 21. Appeal to the supreme court of the United States resulted in reversal (*Lander* v. *Mercantile Bank,* 186 US 458 [22 S Ct 908, 46 L ed 1 247]), with specific direction to reverse the circuit court of appeals and affirm the judgment of the circuit court.

In *Hoenig* v. *Huntington National Bank of Columbus* (1932) (CCA 6), 59 F2d 479, 482, certiorari denied 287 US 648 (53 S Ct 93, 77 L ed 560), it was said:

"It is insisted, however, that the present day building association is a very different type of institution from the 'small, neighborhood, mutual associations of Judge Taft's time,' and emphasis is laid upon the construction of offices in similitude to those of banks, the competition for deposits, the payment of deposits on demand, and the making of loans upon collateral security. We do not think that the general nature of the business of building associations has so far changed as to make the law established by the above-cited cases inapplicable. Compare *United States*

v. *Cambridge Loan & Building Co.*, 278 US 55 (49 S Ct 39, 73 L ed 180). The chief purpose of these institutions is still 'to encourage the building of small houses by poor people, and the saving from their earnings, week by week, of an amount sufficient to pay the mortgage debts incurred in the purchase of the land and the construction of the house.' *Mercantile National Bank* v. *Hubbard* (ND Ohio), 98 F 465, 471."

An examination of the record in the *Hoenig Case* discloses:

1. The assets of the savings and loan associations in Ohio in 1926 were approximately equal to the total assets of all national banks in Ohio; while in 1952 the assets of all savings and loan associations in Michigan constituted less than 15% of the total assets of national banks in Michigan; and

2. The assets of savings and loan associations in Ohio in 1926 were approximately double the total assets of such associations in Michigan in 1952.

Keeping in mind inflation and change in the general status of our economy, the record in the *Hoenig Case* showed that the average investment in the Ohio associations was about $500 compared to approximately $1,500 in Michigan in 1952, and the average outstanding loan was $2,806 in 1926, at the time the *Hoenig Case* was decided, while the average outstanding loan of Michigan associations in 1952 was $4,872.

The home owners' loan act was enacted by congress in 1933 (ch 64, §§ 1–9, 48 Stat 128 [12 USCA, §§ 1461–1468, inclusive, as amended]). The purpose of the act is set forth in section 5 (12 USCA, § 1464, as amended), as follows:

"(a) In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the board is authorized, under such rules and regu-

lations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as 'federal savings and loan associations,' and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States."

In determining States' rights to tax such associations, congress provided in the same section:

"(h) Such associations, including their franchises, capital, reserves, and surplus, and their loans and income, shall be exempt from all taxation now or hereafter imposed by the United States (except the taxes imposed by sections 1410 and 1600 of title 26 with respect to wages paid after December 31, 1939, for employment after such date, and except, in the case of taxable years beginning after December 31, 1951, income, war-profits, and excess-profits taxes), and all shares of such associations shall be exempt both as to their value and the income therefrom from all taxation (except surtaxes, estate, inheritance, and gift taxes) now or hereafter imposed by the United States; and no State, territorial, county, municipal, or local taxing authority shall impose any tax on such associations or their franchise, capital, reserves, surplus, loans, or income greater than that imposed by such authority on other similar local mutual or cooperative thrift and home financing institutions.'"

The trial court commented upon congressional action disclosing that congress did not consider savings and loan associations to be in competition with either State or national banks, and in its opinion said:

"In providing for the taxation of these institutions by the State, congress could have made the measuring stick, the limit on the rate of taxation, that imposed on national banks, also a creation of congress. It could have made such measuring stick the rate imposed by the States on State banks and

it could have made it that imposed on other moneyed capital. It did none of these things. Instead, it provided that the tax imposed should not be greater than that imposed on 'other similar local mutual or cooperative thrift and home financing institutions.'

"Congress thus identified the institutions that it considered to be in competition with Federal savings and loan associations. Obviously, congress did not consider savings and loan associations to be in competition with banks, either State or national."

The home owners' loan act of 1933 provision markedly differs with the provision in regard to States' rights to tax joint-stock land banks (act of congress July 17, 1916, ch 245, § 26, 39 Stat 380) where congress provided:

"Nothing herein shall prevent the shares in any joint stock land bank from being included in the valuation of the personal property of the owner or holder of such shares, in assessing taxes imposed by authority of the State within which the bank is located; but such assessment and taxation shall be in manner and subject to the conditions and limitations contained in section 5219 of the Revised Statutes with reference to the shares of national banking associations."*

The congressional provision for national agricultural credit corporations (act of congress March 4, 1923, ch 252, title 2, § 211, 42 Stat 1469) also provided a different test for State taxation than congress provided for Federal savings and loan associations, as is disclosed by the following:

"Taxation by a State of the shares in national agricultural credit corporations, or of dividends derived therefrom, or of the income of said corporations, or real estate owned by them, shall be such only as is or may be authorized by law in the case of national banking associations; and taxation by a

---

* 12 USCA, § 932.—Reporter.

State of the debentures or other obligations of such corporations shall not be at a higher rate than the rate applicable to other moneyed capital in the hands of individual citizens thereof."*

The following decisions disclose that because plaintiff bank's shares were taxed at a different rate, or assessed by a different method than the method employed to tax the building and loan associations, does not violate RS § 5219:

*Tradesmens National Bank of Oklahoma City* v. *Oklahoma Tax Commission* (1940), 309 US 560, 567 (60 S Ct 688, 84 L ed 947):

"A consideration of the course of judicial decision on RS § 5219 and its predecessors can leave no doubt that the various restrictions it places on the permitted methods of taxation are designed to prohibit only those systems of State taxation which discriminate in practical operation against national banking associations or their shareholders as a class. Compare *First National Bank* v. *City of Hartford*, 273 US 548 (47 S Ct 462, 71 L ed 767, 59 ALR 1); *Amoskeag Savings Bank* v. *Purdy*, 231 US 373 (34 S Ct 114, 58 L ed 274); *Covington* v. *First National Bank of Covington*, 198 US 100 (25 S Ct 562, 49 L ed 963); *Lionberger* v. *Rouse*, 9 Wall (76 US) 468 (19 L ed 721). Thus it is not a valid objection to a tax on national bank shares that other moneyed capital in the State or shares of State banks are taxed at a different rate or assessed by a different method unless it appears that the difference in treatment results in fact in a discrimination unfavorable to the holders of the shares of national banks. *Amoskeag Savings Bank* v. *Purdy, supra; Covington* v. *First National Bank of Covington, supra.*"

*Covington* v. *First National Bank of Covington* (1905), 198 US 100, 114, 115 (25 S Ct 562, 49 L ed 963):

---

* 12 USCA, § 1261.—REPORTER.

"As to the alleged discrimination against shareholders in national banks because the assessment of the property of State banks is upon the franchise and not upon the shares of stock, there is nothing in the bill to show that this difference in method operates to discriminate against national bank shareholders by assessing their property at higher rates than are imposed upon capital invested in State banks. And as to the deduction of the value of real estate and other deductions allowed to State banks, the supreme court of Kentucky has held that all deductions allowed to State banks must be allowed in like manner in assessing the property of shareholders in national banks. *Commonwealth* v. *Citizens' National Bank,* 117 Ky 946 (80 SW 158). Nor does the allegation that in cities of the first, second, and third class State banks are assessed upon their shares for city taxation, but upon their franchises and property for State and county taxation, in the absence of averments of fact showing that thereby a heavier burden of taxation is imposed upon national than State banks in such cities, warrant judicial interference for the protection of shareholders in national banks. *Davenport Bank* v. *Davenport Board of Equalization,* 123 US 83 (8 S Ct 73, 31 L ed 94)."

*People v. Weaver* (1879), 100 US 539 (25 L ed 705), held that the restriction contained in the act of congress (section 5219) had to do with the actual incidence and practical burden of the tax upon the taxpayer.

Appellees introduced testimony, which was not controverted, that building and loan associations pay taxes which appellant bank does not pay (franchise, capital stock increase, use, and personal property taxes), and further disclosed that the ratio of State and local taxes to total assets of the associations was .089, while appellant's rate was .091; and, also, in regard to the proportion of the intangible tax

to the total assets of national banks in Michigan and the proportion of the Michigan franchise tax to the total assets of all savings and loan associations showing a ratio of .02459 for all Michigan national banks and .02243 for all State savings and loan associations.

In dealing with the phrase "coming into competition with the business of national banks" as used in RS § 5219, the court in *First National Bank of Guthrie Center* v. *Anderson, County Auditor* (1926), 269 US 341 (46 S Ct 135, 70 L ed 295), stated (pp 347, 348):

"The earlier decisions have been reviewed from time to time in later cases, and all, taken collectively, may be summarized as showing, so far as is material here

"1. The purpose of the restriction is to render it impossible for any State, in taxing the shares, to create and foster an unequal and unfriendly competition with national banks, by favoring shareholders in State banks or individuals interested in private banking or engaged in operations and investments normally common to the business of banking. *Mercantile Bank* v. *New York,* 121 US 138, 155 (7 S Ct 826, 30 L ed 895); *Des Moines National Bank* v. *Fairweather,* 263 US 103, 116 (44 S Ct 23, 68 L ed 191).

"2. The term 'other moneyed capital' in the restriction is not intended to include all moneyed capital not invested in national bank shares, but only that which is employed in such way as to bring it into substantial competition with the business of national banks. *Mercantile Bank* v. *New York, supra,* 157; *Aberdeen Bank* v. *Chehalis County,* 166 US 440, 461 (17 S Ct 629, 41 L ed 1069).

"3. Moneyed capital is brought into such competition where it is invested in shares of State banks or in private banking; and also where it is employed, substantially as in the loan and investment features

of banking, in making investments, by way of loan, discount or otherwise, in notes, bonds, or other securities with a view to sale or repayment and reinvestment. *Mercantile Bank* v. *New York, supra,* 155–157; *Palmer* v. *McMahon,* 133 US 660, 667, 668 (10 S Ct 324, 33 L ed 772); *Talbot* v. *Silver Bow County,* 139 US 438, 447 (11 S Ct 594, 35 L ed 210).

"4. The restriction is not intended to exact mathematical equality in the taxing of national bank shares and such other moneyed capital, nor to do more than require such practical equality as is reasonably attainable in view of the differing situations of such properties. But every clear discrimination against national bank shares and in favor of a relatively material part of other moneyed capital employed in substantial competition with national banks is a violation of both the letter and spirit of the restriction. *People* v. *Weaver,* 100 US 539 (25 L ed 705); *Boyer* v. *Boyer,* 113 US 689, 701 (5 S Ct 706, 28 L ed 1089); *First National Bank of Wellington* v. *Chapman,* 173 US 205, 216 (19 S Ct 407, 43 L ed 669)."

Building and loan associations are incorporated in Michigan under PA 1887, No 50, as amended, and the purpose of such associations is set forth in section 1,\* as follows:

"Building and improving homesteads, \* \* \* accumulating money to be loaned to its members \* \* \* or assisting its members to accumulate and invest their savings."

Section 37 of the act provides:

"No building and loan association shall, directly or indirectly, do a banking business." (CL 1948, § 489.37 [Stat Ann 1957 Rev § 23.580]).

The fundamental difference between a bank making loans from deposits and loans made otherwise, was recognized in *First National Bank of Shreve-*

---

\* See CL 1948, § 489.1 (Stat Ann 1957 Rev § 23.541).—REPORTER.

*port* v. *Louisiana Tax Commission* (1933), 289 US 60, 64 (53 S Ct 511, 77 L ed 1030, 87 ALR 840), where it is said:

"If we may take judicial notice of the functions of these alleged competitors of the plaintiffs, there appears ample basis for the classification, among other things, in this: There is a fundamental difference between banks, which make loans mainly from money of depositors, and the other financial institutions, which make loans mainly from the money supplied otherwise than by deposits."

Appellant relies on *First National Bank of Hartford* v. *City of Hartford* (1927), 273 US 548 (47 S Ct 462, 71 L ed 767, 59 ALR 1), and states that the trial court:

"Erroneously predicated his decision upon the proposition that savings and loan associations were different in character and in purpose from national banks, and, therefore, could not compete as a matter of law, within the meaning of RS § 5219. This is directly contrary to the ruling of the United States supreme court that:

" 'Competition in the sense intended [by RS § 5219] arises not from the character of the business of those who compete but from the manner of the employment of the capital at their command.' *First National Bank of Hartford* v. *City of Hartford* (1927), 273 US 548, 557."

Appellant, recognizing that its contention was contrary to the cases above cited allowing partial exemption for savings banks and building and loan associations (and particularly was this true in regard to *Bank of Redemption* v. *Boston,* 125 US 60 [8 S Ct 772, 31 L ed 689]) states:

"However, a contention was made by the plaintiff national bank that Massachusetts savings banks were permitted to transact a banking business in the way

of loans upon personal securities which more closely assimilated them to national banks, than to the savings banks such as were involved in *Mercantile* (*Mercantile Bank* v. *New York*). This argument the court summarily considered and dismissed, saying (in *Bank of Redemption* v. *Boston, supra,* 68):

" 'But the difference mentioned, if it exists at all, is immaterial; the main purpose and chief object of savings banks, as organized under the laws of Massachusetts, are the same as those in New York, as considered in the case of the *Mercantile Bank.* They are substantially institutions, under public management, in pursuance of a great and beneficial public policy, organized for the purpose of investing the savings of small depositors, and not as banking institutions in the commercial sense of that phrase.'

"To the extent that this case stands for the proposition that the character, object, and purpose of an institution claimed to be in competition with a national bank was determinative rather than the manner of employment of its capital, this case must be deemed to be overruled by the later cases which held, as stated in *First National Bank of Hartford* v. *Hartford* (1927), *supra,* 557, 558:

" 'Section 5219 is not directed merely at discriminatory taxation which favors a competing banking business. Competition in the sense intended arises not from the character of the business of those who compete but from the manner of the employment of the capital at their command. * * * To so restrict the meaning and application of section 5219 would defeat its purpose.' "

We do not agree with appellant that the *Hartford* decision overruled the *Bank of Redemption Case,* but agree with appellees' answer:

"Appellant attempts to persuade us that the *Bank of Redemption* decision was overruled by *First National Bank of Hartford* v. *City of Hartford,* 273 US 548. There is utterly nothing in the *Hartford* deci-

sion which expressly or impliedly undertakes a repudiation of *Bank of Redemption*. *Hartford* was addressed to a situation where sweeping preferences were granted to large areas of competing money capital."

The *Hartford* decision established that a mixed question of fact and law is involved in determining the question of "substantial competition" and stated (p 552):

"The validity of the tax complained of depends upon whether or not the moneyed capital in the State thus favored is employed in such a manner as to bring it into substantial competition with the business of national banks.

"The question thus raised involves considerations both of fact and of law. To answer it, it is necessary to ascertain the nature and extent of the moneyed capital in the hands of individual citizens within the State and the relation of its employment, in point of competition, to the business of plaintiff and other national banks. It is necessary also to ascertain the precise meaning to be given the statute as applied to the facts in hand in order to determine whether the particular moneyed capital and the particular competition with which we are here concerned are moneyed capital and competition within the spirit and purpose of the statute. The question is thus a mixed one of law and fact, and in dealing with it we may review the facts in order correctly to apply the law."

Not only did the *Hartford* decision deal with sweeping exemptions for a large number of competing institutions, but the equivalence of the tax imposed on national banks and other institutions was not considered, as evidence by the following (pp 551, 552):

"The court below assumed, and it was not questioned upon the argument here, that this tax is not to be taken as an equivalent or substitute for the *ad*

*valorem* tax levied upon bank shares and no question of the possible equivalence of the 2 schemes of taxation is presented."

*First National Bank of Hartford* v. *City of Hartford, supra,* established that "approximate equality in taxation" was a major test, by stating at page 560:

"But a consideration of the entire course of judicial decision on this subject can leave no doubt that State legislation and taxing measures which by their necessary operation and effect discriminate against capital invested in national bank shares in the manner described are intended to be forbidden."

The record in this appeal discloses that Michigan building and loan associations operated in a narrow, restricted field, are markedly different in character, purpose and organization from national banks, and are not in "substantial competition" with national banks.

The record establishes that there was practical equality of the total tax imposed upon building and loan associations and upon national banks, and any difference would be justified as partial exemptions under the decisions of the supreme court of the United States quoted above. The restriction contained in RS § 5219 has to do with the actual incidents and practical burden of the tax imposed. (See *People* v. *Weaver,* 100 US 539 [25 L ed 705].)

Appellant, as a taxpayer claiming immunity from the tax, had the burden of establishing its right to the exemption. There is no presumption of unlawful discrimination or that Michigan PA 1953, No 9, imposed a tax "at a greater rate than [was] assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks." To meet this test, appellant had to introduce proof that was "manifest." (See *Hepburn* v. *School Directors,* 23 Wall

[90 US] 480 [23 L ed 112], and *Norton Company* v. *Department of Revenue of Illinois,* 340 US 534 [71 S Ct 377, 95 L ed 517].) Plaintiff failed to meet this burden of proof.

We reiterate and approve the finding of the trial court:

"That Michigan's tax treatment of savings/building and loan associations is based upon just cause and does not evidence an intent to create or foster a hostile or unfriendly discrimination against national banks."

Affirmed. No costs, a public question involved.

DETHMERS, C. J., and CARR, SMITH, and EDWARDS, JJ., concurred.

KAVANAGH and BLACK, JJ., did not sit.

SOURIS, J., took no part in the decision of this case.